UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

GODWIN PUMPS OF AMERICA, INC.,

    Plaintiff,

v.                                                                              Case No. 8:11-cv-580-T-24-AEP

MACKEY LEE RAMER,

    Defendant.

_____/

## **ORDER**

This cause comes before the Court on Plaintiff Godwin Pumps of America Inc.'s ("Godwin") Motion for Summary Judgment against Defendant Mackey Lee Ramer (Doc. No. 39). Ramer has filed a response in opposition (Doc. No. 42), and Godwin has filed a reply[1] (Doc. No. 52). For the reasons stated below, Godwin's Motion for Summary Judgment is GRANTED in part and DENIED in part.

**I.    Background**

For the purposes of this motion, the following facts are accepted as true: Godwin is a New Jersey corporation that manufactures, rents, and sells pumps, pumping systems, and accessories for use in construction, dewatering, mining, drinking water supply, and water/wastewater bypasses. Godwin requires its employees who have access to internal data to

---

[1] The Court granted Godwin leave to file a reply, in part, to permit Godwin to respond both to Ramer's assertion that Godwin did not address his affirmative defenses, and to the affirmative defenses themselves (Doc. No. 42 at 4–5). Ramer did not file his answer to Godwin's complaint until January 17, 2012 — four days after Godwin filed its motion for summary judgment.

execute restrictive covenants and confidentiality agreements with the company. This internal data includes, but is not limited to, the identities and contacts of existing and prospective customers; service needs of customers; current and anticipated customer requirements or bids; the contents of customer and consultant contracts; profit and loss statements and fiscal reports; manufacturing, inventions, engineering, and research and development; computer software programs; and pricing, policies, price lists, market studies, business plans, operational models, marketing plans or strategies.

As a condition to, and in consideration for, his employment as a Sales Engineer/Sales Representative based out of Godwin's Lakeland, Florida office, Ramer signed a "Confidentiality and Non-Competition Agreement" ("Agreement"). Section 1 of the Agreement, entitled "Protection of Confidential Information" provided, in part, that Ramer was:

> To keep secret and retain in the strictest confidence all confidential Information of [Godwin] learned by [Ramer] heretofore or hereafter, and not to disclose such Confidential Information[2] to anyone outside of [Godwin], either during or after his . . . employment by [Godwin], except in the course of performing his . . . duties hereunder or with [Godwin's] prior express written consent . . . .

(Doc. No. 1, Ex. A at ¶ 1.1). Section 2 of the Agreement, entitled "Non-competition and Non-Soliciation" provided, in part, that for a period of two years after termination of his employment

---

[2] For purposes of the Agreement, "Confidential Information" includes, but is not limited to, "(a) the identities of the Company's customers and customer contacts as well as the identities of the active prospective customers of the Company. . .; (b) the identity, authority and responsibilities of key contacts at each such customer or active prospective customer; (c) the contents of any customer or consultant contracts, current and anticipated customer requirements or bids; (d) the Company's financial information . . .; (e) information relating to the Company's manufacturing, inventions, engineering and research and development; (f) all internal memoranda . . .; (g) computer software programs . . .; (h) pricing policies, price lists, market studies, business plans, operational methods, marketing plans or strategies." (Doc. No. 1, Ex. A at ¶ 1.3).

with Godwin, Ramer agreed not to:

> a) enter the employ of or render any services to any person, firm or corporation specializing in the manufacture, sale and rental of pumping systems . . . ; or
>
> b) engage in any Business in competition with [Godwin] on [Ramer's] own account or become interested in any such Business, directly or indirectly, as an individual, partner, shareholder, director, officer, principal, agent, employee, trustee, consultant, or in any other relationship or capacity . . . .

(Doc. No. 1, Ex. A at ¶ 2.1). Section 2 further provided:

> [U]pon termination of [Ramer's] employment, [Ramer] shall not, for a period of two (2) years following such termination for any reason, directly or indirectly, solicit, seek to divert or assist any customer or active prospective customer[3] of [Godwin] with respect to any Business substantially similar to that engaged in by [Godwin] during [Ramer's] employment.
> . . . .
> [F]or a period of two (2) years following such termination for any reason, [Ramer] shall not solicit, hire, or retain, or seek to hire or retain, any employee of [Godwin] or individual retained by [Godwin] during the six (6) month period preceding [Ramer's] termination of employment with [Godwin].

(Doc. No. 1, Ex. A at ¶ 2.2, 2.3).

Ramer's territory for Godwin included the Florida counties of Hillsborough, Polk, Pasco, Hernando, Citrus, Sumter, Marion, Gilchrist, Lake, Levy, Manatee, and Sarasota. Ramer developed and maintained business opportunities with current and prospective customers; developed and maintained Godwin's relationship with its current and prospective customers; and maintained Godwin's reputation and goodwill among customers and potential customers.

---

[3] The Court interprets "active prospective customer" to mean customers with whom Ramer had "substantial dealings on [Godwin's] behalf while in [Godwin's] employ." *See Solari Indus., Inc. v. Malady*, 264 A.2d 53, 61 (N.J. 1970).

3

In January of 2011, Godwin announced it was changing its compensation structure. Thereafter, on February 17, 2011, Ramer resigned from Godwin and began work for Godwin's direct competitor, National Pump & Compressor[4] ("NPC"). Ramer's initial territory with NPC was substantially similar to his territory with Godwin. Computer forensic analysis determined that several USB flash drives were connected to Ramer's computer in the weeks before Ramer terminated his employment with Godwin. Analysis of the computer showed that information, including internal customer lists, costumer quotes, and a business proposal, were copied onto the flash drives.

On March 18, 2011, Godwin filed a verified complaint against Ramer alleging breach of contract (Count I), breach of the Florida Uniform Trade Secrets Act (Count II), tortious interference with contractual relations (Count III), and unjust enrichment (Count IV). (Doc. No. 1). The Court granted Ramer's motion to dismiss Counts III and IV on June 3, 2011, and on July 8, 2011, the Court enjoined Ramer from "(1) working on behalf of Godwin competitors, including NPC, in Polk, Hillsborough, Pasco, Hernando, Citrus, Marion, Gilchrist, Manatee, Sarasota, and Pinellas counties and the area within a 50-mile radius of those counties; (2) soliciting Godwin employees or customers on behalf of a competitor of Godwin; and (3) disclosing Godwin's confidential information as defined in the Agreement." (Doc. No. 28).

Ramer was deposed on August 12, 2011. There, he explained that he found a flash drive containing Godwin information after he began working for NPC, that he has referenced

---

[4] NPC describes itself as "a leading provider of pumps, compressors, dryers and related equipment for the industrial, petrochemical, refinery, construction, marine, oilfield, municipal, environmental and mining industries." (Doc. No. 1, Ex. B). Ramer describes NPC as a company that "provides pumps for dewatering to the mining, environmental, and construction industries." (Ramer Aff., Doc. 15 at ¶ 15).

Godwin's sales presentation while working for NPC, and that he has solicited business from several of Godwin's customers.

## II. Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must draw all inferences from the evidence in the light most favorable to the non-movant and resolve all reasonable doubts in that party's favor. *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006). The moving party bears the initial burden of showing the Court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. *Id.* Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Johnson v. Bd. of Regents*, 263 F.3d 1234, 1243 (11th Cir. 2001) (quotation omitted).

When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affirmative evidence, designate specific facts showing there is a genuine issue for trial. *Porter*, 461 F.3d at 1320. In determining whether there is a "genuine" issue, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

## III. Discussion

### A. Breach of Contract

#### 1. Choice of Law

Currently, the parties disagree as to whether Florida or New Jersey law controls the breach of contract claim. However, the Court previously concluded that New Jersey contract law applies to the interpretation of the Agreement based on (1) the Agreement's governing law provision,[5] (2) the Court's conclusion that New Jersey law governing the interpretation of confidentiality and non-competition agreements does not contravene Florida's strong public policy,[6] and (3) the parties' earlier agreement in Court filings that New Jersey law applies to the interpretation of the Agreement[7] (Doc. No. 3 at 7–8; Doc. No. 16 at 3). (Doc. No. 28 at 5–6).

### 2. Ramer's Alleged Breaches

In the Agreement, Ramer covenanted not to compete with Godwin during his employment and for two years following the termination of his employment by (1) working for one of Godwin's competitors or engaging in any business in competition with Godwin, (2) soliciting Godwin's current and prospective clients on behalf of any business similar to that engaged in by Godwin, and (3) soliciting any Godwin employee that was retained by Godwin during the six months preceding Ramer's termination of employment. (Doc. No. 1, Ex. A at ¶ 2.1–2.3). Ramer further covenanted to keep confidential all confidential information he learned

---

[5] "This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of New Jersey, without reference to principles of conflicts of law." (Doc. No. 1, Ex. A at ¶ 7.1)

[6] In Florida, courts will generally "enforce[] choice-of-law provisions unless the law of the chosen forum contravenes strong public policy." *Mazzoni Farms, Inc. v. E.I. Dupont De Nemours and Co.*, 761 So. 2d 306, 311 (Fla. 2000).

[7] *Trueblue, Inc. v. Dyn*, No. 09-cv-1894, 2010 WL 1223895, at *2 (M.D. Fla. March 2, 2010) ("It is well established that when the parties to a contract have indicated their intention as to the law which is to govern, it will be governed by such law in accordance with the intent of the parties." (quoting *Dep't of Motor Vehicles for Use and Benefit of Fifth Ave. Motors, Ltd. v. Mercedes-Benz of N. Am., Inc.*, 408 So. 2d 627, 629 (Fla. 2d DCA 1981))).

while working for Godwin.  (Doc. No. 1, Ex. A at ¶ 1.3).

Godwin alleges that Ramer has breached his Confidentiality and Non-Competition Agreement with Godwin.  Godwin states that Ramer has acknowledged that he kept Godwin information on at least one flash drive; that Ramer has conceded that he relied on Godwin's confidential pricing information in his work for Godwin's competitor, NPC; that Ramer has admitted that he referenced a Godwin sales presentation while creating a new presentation for NPC; and that Ramer has acknowledged that, while working for NPC, he successfully solicited business from at least one Godwin customer.  Godwin argues that Ramer's admissions are sufficient to establish his breach of the Agreement as a matter of law.  This Court agrees that Ramer breached the Agreement with respect to competition and solicitation of Godwin's customers.

Ramer acknowledges that he began working for NPC, a business Ramer admits is Godwin's competitor (Doc. No. 51 at 50), on the same day he resigned from Godwin  (Doc. No. 51 at 70–72).  He concedes that NPC hired him to cover most of the state of Florida, including areas in his former territory with Godwin, and that he worked that territory for NPC until he received a letter from Godwin reminding him of his obligations under the Agreement.  (Doc. No. 51 at 54–58, 61–63).  Ramer admits that he attended a business meeting with NPC co-workers at the Mosaic Company, a Godwin customer, and that the purpose of the meeting was to further NPC's efforts to get business or increase business from Mosaic.  (Doc. No. 1 at ¶44; Doc. No. 41 at ¶44; Doc. No. 51 at 33–36).  In addition to Mosaic, Ramer concedes that he contacted a number of other Godwin customers in an effort to solicit business, including: Gulf Coast Boring, U.S. Water Company, Pepper Contracting, Neff Rental, and C.F. Industries (Doc. No. 51 at

7

85–86, 90–91). Ramer has also admitted to generating at least some business for NPC from C.F. Industries. (Doc. No. 51 at 130). With this evidence, Godwin has established that no genuine issue of material fact remains as to whether Ramer breached the Agreement with respect to competition and soliciting Godwin's customers.

However, less clear is whether Ramer breached the Agreement by soliciting Godwin employees and failing to keep confidential information confidential. Ramer admits to contacting two Godwin employees after beginning to work for NPC, but he denies that he spoke to them in order to bring them to NPC. (Doc. No. 51 at 99–100). Ramer also acknowledges that he had possession of a flash drive and several notebooks containing Godwin information after his employment with the company terminated. (Doc. No. 51 at 22–26). The Court has already determined that the vast majority of information Godwin seeks to protect is, in fact, confidential for purposes of its breach of contract claim, and that Ramer recognized as much when he entered into the Agreement. (Doc. No. 28 at 9–11). However, Ramer denies having shared that information with anyone at NPC, and he admits only to having referenced a power-point presentation of his own creation during his employment at NPC. (Doc. No. 51 at 105–07, 139–43). Thus, the Court finds that there is a genuine issue of material fact regarding Ramer's alleged solicitation of Godwin employees and failure to keep confidential information confidential.

### 3.     **Godwin's Conduct**

Ramer argues that his alleged breaches are excused because he was absolved of his obligations under the Confidentiality and Non-Competition Agreement based on Godwin's breach of a compensation agreement between the parties. Ramer contends that the parties

contracted for a specific compensation structure, which Godwin announced it was changing in January 2011. Because Godwin would not confirm that Ramer's compensation would not consequently be reduced, Ramer argues, Godwin breached the compensation agreement and cannot now maintain an action against Ramer for his subsequent failure to perform under the Confidentiality and Non-Competition Agreement.

Ramer's argument that Godwin's failure to perform under his alleged compensation agreement absolves him of his obligation to perform under the Agreement is unavailing. Except for his own assertion, Ramer has not provided the Court with any evidence of a breach of his alleged compensation agreement.

Even assuming a compensation agreement between Godwin and Ramer did exist, the record evidence does not support Ramer's argument that Godwin breached that agreement. To the contrary, Ramer's deposition testimony reveals that he requested confirmation from Carlos Aquino, Ramer's then-Branch Manager, that Godwin would not reduce his pay and change his salary structure. (Doc. No. 51 at 88). Ramer states that Aquino gave him verbal confirmation a number of times, but that he did not get the (presumably written) confirmation he was seeking. (Doc. No. 51 at 88–90). When Godwin's attorney inquired as to whether the company protected Ramer's compensation under the structure, Ramer responded, "I'm not sure." (Doc. No. 51 at 90).

Furthermore, in a sworn statement, Aquino stated:

> Although Godwin rolled out a new compensation structure with different commission rates, it incorporated a changeable salary to account for any differences in compensation between the old structure and the new structure. . . . During my discussions with Mr. Ramer about the New Compensation Structure, I assured him that his compensation would not be reduced under the New Compensation

9

>Structure; that he would never make less money under the New
>Compensation Structure than under the old compensation structure.

(Aquino Aff., Doc. No. 21, Ex. A at ¶¶ 5–6). Ramer has provided no evidence that Godwin ever paid him less than the amount set forth in the alleged compensation agreement.

Moreover, Ramer has provided no support for the proposition that Godwin's alleged breach of a compensation agreement would excuse Ramer's performance of the separate and distinct Confidentiality and Non-Competition Agreement. Instead, the Court notes that the consideration given by Godwin in exchange for Ramer's execution of the Confidentiality and Non-Competition Agreement was the employment of Ramer. Accordingly, the Court rejects Ramer's argument that his alleged breaches are excused by Godwin's conduct.

### 4. Proper Party

Next, Ramer argues that Godwin is not the proper party in interest to this matter by virtue of Godwin "becoming a direct, wholly owned subsidiary of ITT Corporation during Ramer's employment," and later changing its name to "Xylem Dewatering Solutions." (Doc. No. 42 at 5–6). He contends that ITT Corporation and Ramer never executed a new employment agreement, and therefore, a factual issue exists as to whether Godwin retained the rights to the Agreement. Furthermore, Ramer asserts that, even assuming the employment agreement transferred to ITT Corporation, the restrictive covenant would no longer be enforceable under Florida law.

Godwin replies that the changes in its ownership and name do not render the Agreement unenforceable. Godwin states that ITT acquired all of the issued and outstanding shares of Godwin in August 2010; that Godwin continued operating as a legal entity separate from ITT; that in November 2011, ITT sold the Godwin shares to Xylem, Inc.; and that "[i]n December

2011, Godwin filed for a name change, electing to use the name Xylem Dewatering Solutions, Inc., and the alternate name of Godwin Pumps of America." (Doc. No. 52 at 2). Godwin argues the surviving company retains the right to enforce the Agreement, and regardless, Ramer agreed to assignment under Section 7.5 of the Agreement.

Ramer's arguments that Godwin is not the proper party in interest to this matter by virtue of Godwin becoming a subsidiary of ITT Corporation and later changing its name to Xylem Dewatering Solutions are unavailing. Godwin's now-Regional Manager Aquino states in a sworn affidavit that:

> In August 2010, ITT Corporation ("ITT") acquired all of the issued and outstanding shares of Godwin, [making Godwin] a wholly-owned subsidiary of ITT. There [was] no merger or consolidation of Godwin within ITT; therefore, Godwin continued operating as a separate legal entity. In November 2011, ITT sold the Godwin shares to Xylem, Inc. ("Xylem"). That exchange of stock had no effect on the corporate status of Godwin, which continued to exist . . . as a separate legal entity. In December 2011, Godwin filed for a name change, electing to use the name Xylem Dewatering Solutions, Inc., and the alternate name of Godwin Pumps of America. Despite the name change, Godwin maintains the same corporate status as it had throughout Mr. Ramer's employment.

(Doc. No. 52, Ex. A at 2). Following ITT's one-hundred percent purchase of Godwin's stock, Godwin was not dissolved — its existence was not affected by changes in its ownership. *See Corporate Express Office Prods., Inc. v. Phillips*, 847 So. 2d 406, 411 (Fla. 2003). Because Godwin itself continued to exist, albeit under different ownership, the Confidentiality and Non-Competition Agreement is enforceable by the surviving company, regardless of whether Florida or New Jersey law applies. *See J. H. Renarde, Inc. v. Sims*, 711 A.2d 410, 414 (N.J. Super. Ct. Ch. Div. 1998) ("[I]t is preferable to assume that when a business is sold, the purchaser and the employee expect, without new negotiations between them, that the purchaser will honor the

employment contract and that the employees, who choose to remain, will honor the promises made to the former employer."); *See also Corporate Express*, 847 So. 2d at 415 ("[N]either a change in the ownership of corporate stock nor a name change alters a corporation's existence, corporate identity, or corporate rights. Therefore, in contrast to [situations in which] the original business entities were dissolved, no additional assignments necessitating the employees' consent were required to enable [the surviving company] to seek enforcement of the noncompete agreements.") (citation omitted). Furthermore, Ramer agreed to Godwin's ability to assign its rights under the Agreement: "[Godwin] may assign its rights, together with its obligations, hereunder in connection with any sale, transfer or other disposition of all or substantially all of its business or assets." (Doc. No. 1, Ex. A at ¶ 7.5). Accordingly, the Court rejects Ramer's argument that Godwin is not the proper party to enforce the Agreement.

### 5. Conclusion Regarding Breach of Contract

Because no genuine issues of material fact exist as to whether Ramer breached the Agreement by competing and by soliciting Godwin's customers, summary judgment is proper as to those aspects of Godwin's breach of contract claim. However, it is unclear on this record whether Ramer breached the Agreement by soliciting Godwin employees or by keeping confidential information confidential; therefore, summary judgment is not warranted as to those allegations.

### B. Florida Uniform Trade Secrets Act

Godwin alleges that Ramer has improperly misappropriated proprietary information and trade secrets in violation of the Florida Uniform Trade Secrets Act ("FUTSA"), Chapter 688, Florida Statutes. Godwin argues that contemporaneous with Ramer's resignation from Godwin,
12

he downloaded information from his Godwin-issued laptop onto a flash drive. Godwin states that discovery has revealed that this information includes the contact and customer lists for Godwin's Lakeland, Florida branch, a customer rental quote, a dewatering proposal, presentations, data sheets for Godwin's products, price lists, internal bid sheets, and customer pricing details. Godwin maintains that Ramer has conceded that he knowingly disclosed and used Godwin's pricing, sales, and marketing information for his benefit and the benefit of NPC; that he did so without Godwin's authorization; and that by misappropriating Godwin's highly valuable trade secrets, Ramer has irreparably injured Godwin. Accordingly, Godwin argues, it is entitled to summary judgment on its FUTSA claim.

Ramer responds that summary judgment is inappropriate because genuine issues of material fact exist as to whether the information in question qualifies as a "trade secret," and whether Ramer misappropriated that information. Specifically, Ramer contends that Godwin's customer lists, product data sheets, and price lists are all freely available to the public on the internet.

Godwin replies that the information at issue does constitute "trade secrets." It argues that public knowledge of some of Godwin's bidding and pricing information does not affect the status of its other information that is unavailable to the public. Godwin insists that it is not claiming its products alone are trade secrets, and it notes that its data sheets include more than a list of its products. For instance, Godwin contends that its application data sheets are internal worksheets that include factors, formulae, and assessments derived from Godwin's investment of considerable time and resources. Finally, Godwin maintains that Ramer's retention of the Godwin documents and information in his possession, as well as his admitted reliance on them

13

during his employment with NPC, establishes that the information "derives independent economic value, actual or potential." (Doc. No. 52 at 6).

To prevail on a FUTSA claim, a plaintiff must demonstrate that: "(1) the plaintiff possessed secret information and took reasonable steps to protect its secrecy and (2) the secret it possessed was misappropriated, either by one who knew or had reason to know that the secret was improperly obtained or by one who used improper means to obtain it." *Del Monte Fresh Produce Co. v. Dole Food Co., Inc.*, 136 F. Supp. 2d 1271, 1291 (S.D. Fla. 2001) (citing Fla. Stat. § 688.002). "Under Florida law, a trade secret consists of information that (1) derives economic value from not being readily ascertainable by others and (2) is the subject of reasonable efforts to maintain its secrecy." *Am. Red Cross v. Palm Beach Blood Bank, Inc.*, 143 F.3d 1407, 1410 (11th Cir. 1998). The plaintiff must demonstrate both that the specific information it seeks to protect is secret and that it has taken reasonable steps to protect that secrecy. *Id.* However, if the information the plaintiff seeks to protect is generally known or readily accessible to third parties, it cannot qualify as a "trade secret." *See id.* The Court's determination that the information Godwin seeks to protect is "confidential" for purposes of its breach of contract claim does not require a finding that the same information is a "trade secret." *See Roboserve, LTD. v. Tom's Foods, Inc.*, 940 F.2d 1441, 1456 (11th Cir. 1991) ("[A]n item may be considered confidential in the context of a business relationship without rising to the level of a trade secret.") (applying Georgia law).

The Eleventh Circuit has explained that "a trade secret is identified through rigorous examination of the information sought to be protected." *See Roboserve*, 940 F.2d at 1456 (applying Georgia law). Courts hesitate to grant summary judgment when faced with the fact-

14

intensive questions of the existence of a trade secret or whether a plaintiff took reasonable protective steps. *See Furminante Am., Inc. v. T.D. Williamson, Inc.*, 506 F. Supp. 2d 1134, 1141 (M.D. Fla. 2007). Generally, such determinations should be resolved by a fact finder after both sides have fully presented their evidence. *Id.*

Here, Godwin has asserted that Ramer has misappropriated a number of documents, including information on Godwin's customers, Godwin's pricing, and Godwin's products and services. Ramer contends that much of this information is readily available to the public. As exemplars, Ramer provides documents available on the internet that include information on Godwin's products and pricing. (Doc. No. 49, Ex. B; Doc. 50, Ex. A). Ramer also notes that the Southwest Florida Water Management District publishes dewatering applications in newspapers and has an online resource that enables the public to search current and past applications and permits (Doc. No. 15 at 7; Doc. No. 49, Ex. A); Ramer explains these resources can be used to identify potential or current Godwin customers. Further, in his deposition, Ramer stated that information like that at issue here is routinely acquired and collected by competitors from external sources, such as customers. (Doc. No. 51 at 123–24).

Drawing all inferences and viewing the evidence in the light most favorable to Ramer, genuine issues of material fact remain as to whether the information Godwin seeks to protect was generally known or readily accessible to third parties. Therefore, summary judgment is not warranted on Godwin's FUTSA claim.

## IV. Conclusion

Accordingly, it is ORDERED and ADJUDGED that Plaintiff Godwin Pumps of America Inc.'s Motion for Summary Judgment (Doc. No. 39) is GRANTED with respect to Count I, to

the extent that no genuine issues of material fact exist as to whether Ramer breached the Agreement by competing with Godwin and by soliciting Godwin's customers. Otherwise, Godwin's motion is DENIED.

**DONE AND ORDERED** at Tampa, Florida, this 3rd day of April, 2012.

SUSAN C. BUCKLEW
United States District Judge

Copies to:
Counsel of Record